# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Eric Allen Niewind,<br><br>    Plaintiff,<br><br>v.<br><br>Michelle Smith, Chris Esty, Melissa Caffes, Nanette Larson, Kenneth Eldridge, Darryl Quiram, Lon Augdahl, Terry Jorgenson, Steve Huot, Sara Hard, Diane Dau, Marina Fuhrman, Director Centurion Managed Care, and Dawn LaVasseur,<br><br>    Defendants. | Case No. 14-cv-4744 (DWF/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

Eric Allen Niewind, MCF-Stillwater, 970 Pickett Street North, Bayport, MN 55033,[1] pro se

Margaret E. Jacot, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 900, Saint Paul, MN 55101, for Michelle Smith, Chris Esty, Melissa Caffes, Nanette Larson, Terry Jorgenson, Steve Huot, Sara Hard, Diane Dau, Marina Fuhrman, and Dawn LaVasseur

Anthony J. Novak and Mark A. Solheim, Larson King, LLP, 30 East Seventh Street, Suite 2800, Saint Paul, MN 55101, for Kenneth Eldridge, Darryl Quiram, Lon Augdahl, and Director of Centurion Managed Care

HILDY BOWBEER, United States Magistrate Judge

    This matter is before the Court on Defendants Michelle Smith, Chris Esty, Melissa

---

[1] Mail sent from the Clerk of Court to Plaintiff at this address was returned as undeliverable with no forwarding address. [*See* Doc. Nos. 73, 74.] According to the DOC Defendants, Plaintiff was released on supervised release on June 16, 2015. (Courtney Aff. ¶ 2 & Ex. A [Doc. No. 55].) Plaintiff has not provided the Court with a new address, nor has he communicated with the Court since his release.

Caffes, Nanette Larson, Terry Jorgenson, Steve Huot, Sara Hard, Diane Dau, Dawn LaVasseur, and Marina Fuhrman's Motion for Summary Judgment [Doc. No. 53]; and Defendant Kenneth Eldridge, Darryl Quiram, Lon Augdahl, and Director of Centurion Managed Care's Motion for Summary Judgment [Doc. No. 66]. Plaintiff did not oppose or otherwise respond to the motions.

The motions were referred to the undersigned United States Magistrate Judge for the issuance of a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, the Court recommends granting the motions, dismissing the federal law claims with prejudice, and dismissing the state law claims without prejudice.

## I.     Background

During the relevant events, Plaintiff was an inmate at the Minnesota Correctional Facility in Stillwater, Minnesota ("MCF-Stillwater"). Ten Defendants are employees of the Minnesota Department of Corrections ("DOC") who work or worked at MCF-Stillwater: Michelle Smith, Warden; Chris Esty, Associate Warden; Marina Fuhrman, Director of the Atlantis Program; Terry Jorgenson, Psychology Director; Melissa Caffes, Health Services Administrator; Nanette Larson, DOC Director of Health Services; Sara Hard, R.N.; Diane Dau, R.N.; Steve Huot, DOC Director of Behavioral Health Services; and Dawn LaVasseur (named in the Second Amended Complaint as John/Jane Doe and now known as Dawn McCarthy[2]), a dental employee (collectively "DOC Defendants"). (Second Am. Compl. at 2-3 [Doc. No. 30].) The other four Defendants are three doctors

---

[2]  Defendant Dawn LaVasseur is now known as Dawn McCarthy. (*See* McCarthy Aff. [Doc. No. 62].) Because her name has not been changed on the case caption, nor does LaVasseur ask that it be changed, the Court will refer to her as LaVasseur.

employed by Centurion Managed Care (Dr. Kenneth Eldridge, Dr. Darryl Quiram, and Dr. Lon Augdahl), and the Director of Centurion Managed Care (collectively "Centurion Defendants"). (*Id.* at 3; Paulson Aff. ¶ 3 [Doc. No. 63].)

Centurion is a medical services vendor that provides physicians, certified nurse practitioners, psychiatrists, and other medical professionals to the DOC pursuant to a contract. (Paulson Aff. ¶ 3.) The DOC is responsible for providing health services for individuals incarcerated at DOC facilities. Some of those services are provided by DOC employees and others are provided by Centurion employees. (*Id.*) Both DOC and Centurion employees provided medical treatment to Plaintiff.

The operative pleading in this matter is the Second Amended Complaint [Doc. No. 30], which was filed on April 17, 2015. The gravamen of the Second Amended Complaint is that DOC and Centurion employees provided inadequate treatment of Plaintiff's narcolepsy and dental problems. Plaintiff alleges the following facts against each Defendant:

- Centurion Defendant Dr. Quiram allegedly failed to review Plaintiff's medical records; used a mail-order pharmacy rather than a local pharmacy to refill Plaintiff's Adderall prescription, thus delaying medication; ceased Plaintiff's medication on May 27, 2014; failed to refer Plaintiff to a specialist; and prevented Plaintiff from participating in the Atlantis Program. (Second Am. Compl. at 5-6.)

- Centurion Defendant Dr. Eldridge allegedly referred Plaintiff to psychiatric care instead of a medical provider for treatment of his narcolepsy; and discontinued Plaintiff's narcolepsy medication from May 9 to May 27, 2014, which compromised Plaintiff's safety and put him at risk of serious injury. (Second Am. Compl. at 6-7.)

- Centurion Defendant Dr. Augdahl allegedly refused to provide psychiatric treatment to Plaintiff on the ground that narcolepsy is a medical condition; discontinued his narcolepsy medication; and made medical decisions based on

3

information from DOC staff who are not doctors and without reading Plaintiff's
medical records.  (Second Am. Compl. at 7-8.)

- The Director of Centurion Managed Care allegedly denied Plaintiff an
  appointment with a sleep specialist; did not allow a prescription of Provigil in
  addition to Adderall; and practiced medicine without a license.  (Second Am.
  Compl. at 8.)

- DOC Defendant Fuhrman allegedly provided false information about Plaintiff's
  sleepiness; did not spend enough time with Plaintiff; retaliated against Plaintiff
  for reporting the sexual harassment of another inmate by requiring Plaintiff to sign
  a probation contract on April 23, 2014; retaliated against Plaintiff for pointing out
  staff inadequacies by requiring him to sign a behavioral contract on July 9, 2014;
  threatened to retaliate against Plaintiff on September 30, 2014, and October 16,
  2014, for writing a kite about Dr. Quiram and Caffes; deprived Plaintiff of
  medication and medical care for a serious condition; and committed malpractice
  by providing information to others and acting outside the scope of her
  employment.  (Second Am. Compl. at 9-10.)

- DOC Defendant Jorgenson allegedly instructed Dr. Augdahl to discontinue
  Plaintiff's Adderall; practiced medicine without a license; falsely denied he was
  not involved with Plaintiff's medical treatment; failed to adequately supervise
  Fuhrman; and prevented Plaintiff from participating in the Atlantis Program.
  (Second Am. Compl. at 10-11.)

- DOC Defendant Caffes allegedly destroyed five kites without Plaintiff's consent;
  denied Plaintiff access to his medical records; allowed non-medical personnel to
  be involved in Plaintiff's medical care; caused Plaintiff's medication to be delayed
  by two weeks by ordering the medication through the mail instead of going to a
  local pharmacy; threatened Plaintiff with discipline for a kite written on
  September 28, 2014; falsified Plaintiff's medical records by indicating he agreed
  with treatment; allowed medication to be discontinued; and failed to insure that
  doctors' orders were followed and appointments were made.  (Second Am. Compl.
  at 11-13.)

- DOC Defendant Hard allegedly verbally abused and discriminated against
  Plaintiff on May 9, 2014, by announcing, "The kid on Adderall is here" at an
  appointment.  (Second Am. Compl. at 13.)

- DOC Defendant Dau allegedly recorded false information in Plaintiff's medical
  record reflecting that he agreed with treatment decisions; threatened Plaintiff with
  discipline for a kite written on September 28, 2014; and assisted Caffes in

destroying kites.  (Second Am. Compl. at 13-14.)

- DOC Defendant Huot allegedly failed to return kites Plaintiff sent on September 9 and November 6, 2014, concerning Fuhrman's and Jorgenson's conduct; and failed to adequately supervise Fuhrman and Jorgenson.  (Second Am. Compl. at 14.)

- DOC Defendant Larson allegedly failed to ensure that her orders were followed, such as a letter she wrote to Dr. Quiram and Caffes asking them to determine the appropriate dosage of Adderall; and prevented Plaintiff from seeing a specialist. (Second Am. Compl. at 15.)

- DOC Defendant LaVasseur allegedly ignored Plaintiff's sick call slips that he suffered dental pain; failed to treat Plaintiff's cavities and caused a tooth to be extracted; refused to provide routine dental care; and caused Plaintiff's teeth to degrade resulting in severe pain.  (Second Am. Compl. at 16.)

- DOC Defendant Esty allegedly failed to answer kites in September, November, and December 2014, in which Plaintiff asked Esty to intervene in the conduct of Caffes, Jorgenson, and Fuhrman; and did not adequately supervise his subordinates.  (Second Am. Compl. at 16-17.)

- DOC Defendant Smith allegedly failed to answer kites in September, November, and December 2014, in which Plaintiff asked Smith to intervene in the conduct of Caffes, Jorgenson, and Fuhrman; and did not adequately supervise her subordinates.  (Second Am. Compl. at 17.)

Based on the above factual allegations, Plaintiff brings claims under 42 U.S.C.

§ 1983 for violations of the First, Eighth, and Fourteenth Amendments; claims under the

Americans with Disabilities Act ("ADA"); and state law claims of malpractice, gross

negligence, and practicing medicine without a license.  Plaintiff sues all Defendants in

their individual and official capacities, and he seeks monetary damages from each

Defendant, as well as injunctive relief concerning his medication regimen.

Defendants filed their respective motions for summary judgment on December 15,

2015.  According to evidence submitted by the DOC Defendants, Plaintiff suffers from

narcolepsy and has a history of substance abuse.  (Paulson Aff. ¶ 11.)  When Plaintiff

entered treatment at MCF-Stillwater, the DOC was faced with "an entirely novel

situation: how to accommodate a chemically-dependent inmate's need to take a highly

addictive controlled substance while he participates in a program to treat addiction."

(DOC Defs.' Mem. Supp. Mot. Summ. J. at 1; *see* Paulson Aff. ¶ 25.)  The DOC

Defendants concede Plaintiff was without his narcolepsy medication for a brief period of

time while medical staff determined the best approach, and submit evidence that Plaintiff

suffered no adverse effects.  The DOC and Centurion Defendants seek summary

judgment on all claims.  Plaintiff did not oppose the motions or otherwise respond.

## II.      Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might

affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the

evidence is such that a reasonable jury could return a verdict for the non-moving party.

*Id.*  In considering a motion for summary judgment, the court views the evidence and the

inferences that may be reasonably drawn from the evidence in the light most favorable to

the nonmoving party.  *Enter. Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir.

1996).

The party opposing a properly supported motion for summary judgment may not

rest on mere allegations or denials, but must set forth specific facts in the record showing

6

there is a genuine issue for trial.  *Anderson*, 477 U.S. at 256.  "Like any other civil litigant," a pro se plaintiff must respond to a defendant's motion for summary judgment "with specific factual support for his claims" sufficient to sustain a jury verdict in his favor.  *Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001); *see Anderson*, 477 U.S. at 249-52.

## III.    Discussion

### A.    Official Capacity § 1983 Claims Against the DOC Defendants

The DOC Defendants seek summary judgment on the § 1983 claims brought against them in their official capacity.  "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the . . . State itself."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citations omitted).  "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."  *Id.*; *see* 42 U.S.C. § 1983 ("Every *person* who . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" is liable to the injured party.) (emphasis added).  Consequently, Plaintiff's § 1983 claims brought against the DOC Defendants in their official capacities should be dismissed.

### B.    Individual Capacity § 1983 Claims

The DOC Defendants seek summary judgment on the individual capacity § 1983 claims on the grounds of qualified immunity.  "Qualified immunity may protect government officials from liability under 42 U.S.C. § 1983, but not if their conduct

violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 527 (8th Cir. 2009) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  In analyzing a claim of qualified immunity, the Court considers: (1) whether the facts viewed in the light most favorable to Plaintiff support a conclusion that Defendants violated a constitutional right, and (2) whether the constitutional right at stake was "clearly established" at the time of the alleged violation "such that a reasonable official would have known that his or her actions were unlawful." *Id.* at 528 (citing *Pearson v. Callahan*, 555 U.S. 223, 232-33 (2009)).  The Court has discretion which prong "should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.  When a court concludes that a constitutional right was not violated, it need not address whether the right was clearly established at the time of the alleged violation.  *Fields v. Abbott*, 652 F.3d 886, 894 (8th Cir. 2011).  Under the circumstances of this case, it makes sense to discuss first whether the DOC Defendants violated Plaintiff's constitutional rights.

The Centurion Defendants do not claim qualified immunity, but their arguments on the merits of Plaintiff's constitutional claims overlap with the DOC's arguments that Plaintiff's constitutional rights were not violated.  Although the Centurion Defendants are not state employees, they do not deny they can be treated as "state actors" for § 1983 purposes.  *See West v. Atkins*, 487 U.S. 42, 54-55, (U.S. 1988).  Given the overlap of facts and law on the constitutional questions, the Court will discuss the § 1983 claims brought against the DOC and Centurion Defendants together.

8

### C.      Plaintiff's § 1983 Claims

### 1.      First Amendment Claims

Plaintiff brings First Amendment claims against DOC Defendants Fuhrman, Dau, Caffes, Esty, Smith, and Jorgenson.  Fuhrman is the Director of the Atlantis Chemical Dependency Treatment Program at MCF-Stillwater ("Atlantis Program").  (Fuhrman Aff. ¶ 1 [Doc. No. 58].)  Plaintiff claims Fuhrman retaliated against him for writing a kite about Dr. Quiram and Caffes, by requiring him to sign a probation contract on April 23, 2014; requiring him to sign a behavioral contract on July 9, 2014; and threatening him with discipline on September 30, 2014, and October 16, 2014.  Esty is the Associate Warden of MCF-Stillwater, and Smith was formerly the Warden.  (Paulson Aff. ¶ 34.)  Plaintiff alleges Esty, Smith, and Jorgenson failed to stop Fuhrman from retaliating against him.  Dau is a licensed nurse and a nursing supervisor at MCF-Stillwater.  (Dau Aff. ¶ 1 [Doc. No. 56].)  Plaintiff alleges Dau threatened him with discipline for a kite he wrote on September 28, 2014.  Caffes was the Health Services Administrator at MCF-Stillwater, and in that capacity, she supervised nurses and provide administrative and operational management.  (Paulson Aff. ¶ 6.)  Plaintiff alleges Caffes also threatened him with discipline for writing the September 28, 2014, kite.

### a.      Threats of Discipline

"[T]he First Amendment right to petition for redress of grievances includes redress under established prison grievance procedures."  *Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir. 1994) (citing *Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989)).  To prevail on a First Amendment claim for retaliation, Plaintiff "must show that '(1) he engaged in a

protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity.'" *Saylor v. Nebraska*, 812 F.3d 637, 645-46 (8th Cir. 2016), *as amended* (Mar. 4, 2016), *reh'g denied* (Mar. 28, 2016) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)).

With respect to Plaintiff's claims against Fuhrman, Dau, and Caffes for allegedly threatening him with discipline in retaliation for writing kites advocating for his medical care, Plaintiff has produced no evidence to support his allegations that these Defendants took adverse action against him, that their actions would have chilled an ordinary person from writing kites, or that their actions were motivated at least in part by the protected activity. Admittedly, even "a threat of retaliation is sufficient injury if made in retaliation for an inmate's use of prison grievance procedures." *Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir. 1994). But here, the undisputed evidence shows that Fuhrman did not threaten Plaintiff with discipline for writing a kite. (Fuhrman Aff. ¶ 22.) Rather, she questioned Plaintiff about the kite because the language he used was rude, and because Caffes, the subject of the kite, felt threatened by it. (*Id.*) Eliminating rude and threatening behavior is a specific goal of the Atlantis Program; thus, Fuhrman "would have chastised Niewind for the manner in which he presented his concerns, not for the content." (*Id.*) There is no evidence of any ill motive. Nor is there any evidence that Fuhrman's actions chilled Plaintiff from writing kites or that her conduct would have chilled a person of ordinary firmness from writing kites. Fuhrman should be granted summary judgment on Plaintiff's First Amendment claim against her.

With respect to Dau, Plaintiff alleged in the Second Amended Complaint that she verbally threatened him with discipline for writing a threatening kite, but there is no evidence to support this allegation.  Dau, on the other hand, submitted a sworn affidavit that she never threatened Plaintiff, and that she did not even consider his kite threatening in tone, though she found it rude.  (Dau Aff. ¶¶ 8, 10.)  Similarly, there is no evidence that Caffes threatened to discipline Plaintiff for the kite.  Dau and Caffes should also be granted summary judgment on this claim.

### b.        Destruction of Kites

Dau and Caffes met with Plaintiff in July 2014 to discuss multiple kites about his medical care.  (*Id.* ¶ 11.)  Caffes offered to return the kites to Plaintiff after the meeting, but he declined.  (*Id.*)  In accordance with DOC policy, the kites were destroyed.  (*Id.*)  There is no evidence that Dau's or Caffes's actions chilled Plaintiff from writing kites or would have chilled a person of ordinary firmness from writing kites.  Nor is there any evidence that Dau's or Caffes's actions were motivated by Plaintiff's exercise of protected activity.  Rather, their actions were motivated by the requirements of MCF-Stillwater's document retention policy.  Dau and Caffes should be granted summary judgment on this First Amendment claim.

### c.        Probation and Behavioral Contracts

Plaintiff claims that Fuhrman retaliated against him by requiring him to sign a probation contract and behavioral contract.  Plaintiff has not shown, however, that Fuhrman's conduct would have chilled an ordinary person from continuing the activity or that Fuhrman's actions were motivated in part by the exercise of protected activity.

11

The Atlantis Program is a long-term treatment program available to inmates with custody levels that would preclude participation in other DOC treatment programs. (*Id.* ¶ 4.) When an inmate does not behave appropriately in treatment, the therapist may provide a variety of interventions, including placing the inmate on a behavioral contract or a probation contract. (*Id.* ¶ 8.) Such contracts are very common in the Atlantis Program. (*Id.* ¶ 9.) They are not used as a form of punishment, but are designed to help the inmate achieve his treatment goals by targeting specific negative behaviors and encouraging positive behaviors. (*Id.*)

According to Plaintiff's treatment records, he was placed on a probation contract on April 23, 2014, because he was undermining his treatment by focusing on what he perceived to be staff inadequacies, and because he broke confidentiality rules by telling another inmate what was shared in group therapy. (*Id.* ¶ 13 & Ex. E; Edokpayi Aff. ¶ 4 [Doc. No. 57].) Though Plaintiff claims he was retaliated against for reporting the sexual harassment of another inmate, there is no evidence that Plaintiff reported the sexual harassment of another inmate or even that Plaintiff suspected another inmate had been sexually harassed. (Fuhrman Aff. ¶ 15.) Plaintiff's Atlantis Program therapist, Osatohamwen Edokpayi, placed Plaintiff on a behavioral contract in July 2014 because Plaintiff had reverted to former behaviors such as focusing on the perceived inadequacies of others rather than examining his own behavior. (Edokpayi Aff. ¶ 6.) Treatment notes are consistent with this explanation and reveal no other motivation for the contract. (Fuhrman Aff. Ex. F.) A third contract in October 2014 was drafted by Plaintiff personally after he recognized his need for a contract. (Edokpayi Aff. ¶ 8.)

12

In sum, Plaintiff's First Amendment claims based on the probation and behavioral contracts fail as a matter of law.

### d.      Claims Against Supervisors

Because Plaintiff has not shown he was retaliated against, his claims that Esty, Smith, and Jorgenson failed to prevent the retaliation also fail.  *See Gibson v. Weber*, 433 F.3d 642, 647 (8th Cir. 2006).  Alternatively, those claims fail because no facts establish that Esty, Smith, or Jorgenson personally violated Plaintiff's First Amendment rights or "personally displayed deliberate indifference to the risk" that such rights would be violated.  *See Whitson v. Stone Cty. Jail*, 602 F.3d 920, 928 (8th Cir. 2010); *Ottman v. City of Independence*, 341 F.3d 751, 761 (8th Cir. 2003).

### 2.      Eighth Amendment Claims

Plaintiff brings Eighth Amendment claims against all Defendants.  "The Eighth Amendment 'prohibits the infliction of cruel and unusual punishments on those convicted of crimes.'"  *Nelson*, 583 F.3d at 528 (quoting *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991)).  With respect to medical care and conditions of confinement, the question is whether the prison official acted with "deliberate indifference."  *Id.* (citing *Wilson*, 501 U.S. at 303).  To establish an Eighth Amendment violation, Plaintiff must show "that he suffered from one or more objectively serious medical needs, and that prison officials actually knew of but deliberately disregarded those needs."  *Hartsfield v. Colburn*, 491 F.3d 394, 396-97 (8th Cir. 2007).  The deliberate indifference standard "has both an objective and a subjective component."  *Nelson*, 583 F.3d at 529.

To meet the objective component, Plaintiff "must show that he suffered from an

objectively serious medical need." *Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014). "A medical need is objectively serious if it either has been 'diagnosed by a physician as requiring treatment' or is 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). Plaintiff must show through "'verifying medical evidence' that the defendants ignored an acute or escalating situation or that delays adversely affected the prognosis given the type of injury in this case." *Dulany v. Carnahan*, 132 F.3d 1234, 1243 (8th Cir. 1997) (citation omitted).

To meet the subjective component, Plaintiff must show that a defendant "actually knew of but deliberately disregarded his serious medical need." *Scott*, 742 F.3d at 340. This equates to the mental state of "criminal recklessness: disregarding a known risk to the inmate's health." *Id.* (quoting *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)). "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are "serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citation omitted). A prison physician's "failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). The Eighth Amendment does not prevent prison doctors from exercising their independent medical judgment, and prisoners do not have a constitutional right to any particular type of treatment. *Id.*

a.       **Narcolepsy**

According to Dr. Paulson, the Medical Director for the DOC, "[n]arcolepsy is a neurological disorder caused by the brain's inability to regulate sleep-wake cycles normally" and "is characterized by overwhelming daytime drowsiness and sudden attacks of sleep."  (Paulson Aff. ¶ 11.)  If untreated, "narcolepsy does not alter a person's physiology or lead to long-term medical repercussions."  (*Id.* ¶ 12.)  The greatest danger is that the individual could fall asleep while performing an activity that requires alertness such as driving or operating heavy machinery.  (*Id.*)  Plaintiff did not perform any such activities at MCF-Stillwater.  If a person complains of narcolepsy, the first step typically is to refer the patient to a sleep specialist for diagnosis through sleep studies.  (*Id.* ¶ 13.)  Once narcolepsy is diagnosed, it is usually treated with prescription stimulant medication to help the individual remain alert during the day.  (*Id.*)  Adderall is commonly prescribed for narcolepsy.  (*Id.* ¶ 14.)  Adderall is an amphetamine, a level 2 controlled substance, and is highly addictive with a high potential for abuse, similar to methamphetamine.  (*Id.* ¶¶ 14-15.)  Use of Adderall in a prison environment is strictly managed.  (*Id.* ¶ 16.)

When Plaintiff entered custody in 2012, the DOC had no records of a narcolepsy diagnosis or treatment.  (*Id.* ¶ 19.)  In October 2013, Plaintiff mentioned a history of narcolepsy but did not request treatment.  (*Id.*)  After obtaining Plaintiff's authorization for the release of medical records in November 2013, the DOC obtained from St. Cloud Hospital records containing a report of a sleep study conducted in 2004 by Dr. Keith Larson.  (Paulson Aff. ¶ 19 & Ex. H.)  Dr. Larson concluded the study could be considered normal or could indicate a sleep disorder and that further testing would be

necessary to diagnose narcolepsy.  (*Id.*)

In December 2013, Plaintiff first requested treatment for narcolepsy, but he could not describe his specific symptoms or his most recent lapse of consciousness.  (*Id.* ¶ 20.) Plaintiff also sought treatment for narcolepsy again in January 2014, but still could not provide a specific description of his symptoms.  (*Id.* ¶ 21.)  In March 2014, Plaintiff provided the MCF-Stillwater clinic with additional records of his sleep disorder, including a January 2005 letter from Dr. Larson to Plaintiff's attorney at that time, which described a sleep study "suggesting very strongly the diagnosis of narcolepsy."  (*Id.* ¶ 22 & Ex. I.)  On March 18, 2014, DOC physician Dr. Norman Wolk reviewed all of Plaintiff's medical records, including Dr. Larson's records, and concluded that Niewind had been formally diagnosed with narcolepsy.  (Paulson Aff. Ex. F.)  Plaintiff told Dr. Wolk that he was experiencing episodes of sudden sleep onset and often felt unrefreshed.  (*Id.*)  Dr. Wolk prescribed 10 mg of Adderall two times a day.  (Paulson Aff. ¶ 23.)  Plaintiff first received Adderall on April 1, 2014.  (Dau Aff. ¶ 5.)

Plaintiff entered chemical dependency treatment through the Atlantis Program in April 2014.  (Paulson Aff. ¶ 24; Fuhrman Aff. ¶ 13.)  The next month, he asked for an increase is his Adderall dosage, explaining he was having difficulty concentrating and fell asleep frequently in class.  (Paulson Aff. Ex. F.)  Dr. Eldridge declined to increase the dosage.  (Paulson Aff. ¶ 24.)  On May 29, 2014, Adderall was discontinued due to concerns about Plaintiff taking Adderall while he was in chemical dependency treatment and questions concerning whether Plaintiff's care should be managed by the psychiatry division or health services department.  (*Id.*; Dau Aff. ¶ 5.)

16

Plaintiff's situation was novel to the DOC.  (Paulson Aff. ¶ 26.)  Narcolepsy is

rare; indeed, Dr. Paulson had not seen another diagnosed case of narcolepsy in the DOC.

(*Id.* ¶ 25.)  Nor could Paulson recall another instance where an offender in chemical

dependency treatment required daily, long-term treatment with a controlled substance.

(*Id.*)  Because controlled substances are so addictive, an individual's use of such

substances while undergoing chemical dependency treatment is disfavored.  (*Id.*)

Doctors were concerned that Plaintiff's use of Adderall would interfere with his ability to

successfully complete treatment or that he would divert the medication to other

participants in the program, which is common in prisons.  (*Id.* ¶¶ 17, 25.)

Dr. Augdahl, a psychiatrist, was selected to review Plaintiff's medical records and

verify the narcolepsy diagnosis.  (*Id.* ¶ 26.)  As a psychiatrist, Dr. Augdahl had passed

board examinations in neurology as well as psychiatry.  (*Id.*)  Dr. Augdahl confirmed the

narcolepsy diagnosis on June 6, 2014.  (*Id.*)  Despite Plaintiff's significant history of

controlled substance abuse and strong need for substance abuse treatment, the medical

team at MCF-Stillwater assigned to Plaintiff's case nonetheless determined Adderall

should be re-prescribed so that he could stay awake during treatment classes.  (*Id.* ¶ 27.)

The team also decided that medical, not psychiatry, staff would manage Plaintiff's

treatment since narcolepsy is a medical condition.  (*Id.*)  On June 6, 2014, Dr. Quiram

renewed Plaintiff's Adderall prescription.  (Dau Aff. ¶ 6 & Ex. B.)

Because Adderall is a controlled substance, the pharmacy must receive a hard

copy of the prescription before dispensing it.  (Dau Aff. ¶ 6.)  Plaintiff's Adderall

prescription was mailed to the DOC's pharmacy in Indiana, Pennsylvania, and the

medication was received by MCF-Stillwater in time for the June 11, 2014, medication pass.  (*Id.*)  Plaintiff was provided Adderall that day.  (*Id.*)  If medication is needed urgently, as dictated by the prescribing physician, the DOC can obtain it from a local pharmacy.  (*Id.*)  Dr. Augdahl did not indicate that Plaintiff urgently needed Adderall.

Plaintiff went without Adderall for less than two weeks.  (Paulson Aff. ¶ 28.) Adderall does not cause harm if ceased suddenly.  (*Id.*)  Plaintiff may have felt more sleepy during those two weeks, but he did not fall, injure himself, or suffer any setbacks in his condition or treatment due to the delay in receiving medication.  (*Id.*)  When Plaintiff's therapist observed Plaintiff looking sleepy, he encouraged him to stand up or engage in a discussion.  (Edokpayi Aff. ¶ 9.)

Plaintiff asked Dr. Quiram to increase the dosage of Adderall in September 2014 because he was having trouble staying awake during the day.  (Paulson Aff. ¶ 29.) Dr. Quiram asked program staff about Plaintiff's sleepiness and daily activities, and only his therapist reported a single instance of Plaintiff falling asleep.  (*Id.* ¶¶ 29-30.) Dr. Quiram declined to increase the dosage, but he changed the Adderall prescription from short-acting to extended release.  (*Id.* ¶ 33.)

The undisputed evidence of record establishes that no DOC or Centurion Defendant actually knew of, but deliberately disregarded, a serious medical need. No evidence establishes that Plaintiff's narcolepsy was an acute or escalating situation, or that the two-week discontinuation of Adderall adversely affected his prognosis or completion of chemical dependency treatment.  No evidence establishes that any Defendant had a mental state approximating criminal recklessness or purposefully caused

a substantial risk of serious harm to Plaintiff.

Rather, the undisputed evidence shows that the medical staff at MCF-Stillwater was faced with a novel situation that posed legitimate, competing concerns: (1) that Plaintiff succeed in treatment for controlled substance use, and (2) that Plaintiff receive appropriate treatment for narcolepsy.  Adderall was discontinued for two weeks so that DOC and Centurion staff could balance these concerns and maximize the benefit to Plaintiff.  Plaintiff's quibbles to physicians' reviews of his medical records, using a mail-order pharmacy instead of a local pharmacy, no referral to a specialist, involvement of the psychiatry division, and failure to prescribe Provigil in addition to Adderall are no more than differences of opinion that do not rise to the level of an Eighth Amendment violation.

### b.   Dental Problems

On July 31, 2012, before Plaintiff was transferred to MCF-Stillwater, he had an intake dental examination at another correctional facility.  (McCarthy Aff. ¶ 8.)  Dental records from that appointment document several fillings, including a silver filling on a baby tooth; fair oral hygiene; a fractured tooth at #3M; slight gingivitis; evidence of teeth grinding; and a small chip on tooth #3.  (*Id.*)  Approximately seven months after Plaintiff arrived at MCF-Stillwater, he submitted a kite requesting a dental cleaning.  (*Id.* ¶ 9.)  Under the DOC dental services policy, an offender must serve at least thirty-six months of his sentence before he is eligible for routine dental care such as a cleaning.  (*Id.* ¶ 3.)  Plaintiff had not yet served thirty-six months, and dental assistant LaVasseur sent him a copy of the policy.  (*Id.* ¶ 9.)

19

On January 6, 2014, Plaintiff signed up for sick call stating he needed to have a tooth extracted, and a nurse referred him for a dental appointment.  (*Id.* ¶ 10.)  The sick call slip did not indicate that Plaintiff had any pain or swelling, and the appointment was deemed non-urgent.  (*Id.*)  The nurse's progress note recorded Plaintiff's reported pain as a five on a ten-point scale and indicated the pain had started a few weeks earlier.  (*Id.*)  The information on the progress note did not change LaVasseur's opinion that Plaintiff's tooth concern was not urgent, and she scheduled Plaintiff for the next available, non-urgent appointment.  (*Id.*)

Plaintiff attended that appointment on January 16, 2014.  (*Id.* ¶ 11.)  The dentist determined that a baby molar tooth had distal decay with tissue growing through the defect.  (*Id.*)  The dentist deemed the tooth non-restorable and extracted it, with Plaintiff's consent.  (*Id.*)  LaVasseur was not the dental assistant for that procedure, but in her experience, baby teeth are particularly susceptible to decay or loss during adulthood, and the loss of Plaintiff's tooth was not due to any inaction by any dental staff member. (*Id.* ¶¶ 11-12.)  Neither a cleaning in July 2013 nor an earlier appointment in January 2014 would have changed the prognosis for the tooth.  (*Id.* ¶ 12.)

Plaintiff sent kites to the dental clinic on May and June 2014, asking for fillings for cavities.  (*Id.* ¶¶ 13-14. )  He did not describe extreme pain or swelling.  (*Id.* ¶ 14.) LaVasseur sent Plaintiff copies of the DOC dental policy and determined from his chart that no areas of decay had been observed previously.  (*Id.* ¶ 13.)  On July 3, 2014, Plaintiff was seen in the dental clinic for what he described as urgent pain, but the dentist did not find any cavities.  (*Id.* ¶ 15.)  The dentist observed one tooth with recessive gums

and root exposure that could cause pain and temperature sensitivity, and recommended brushing with Sensodyne toothpaste. (*Id.*) A second tooth was merely stained, and a third tooth had a filling that Plaintiff had mistaken for a cavity. (*Id.*)

The undisputed evidence of record establishes that LaVasseur did not ignore Plaintiff's dental complaints; his dental concerns were not acute or escalating; and any treatment or delay in treatment did not adversely affect his dental health. Nor is there any evidence that LaVasseur actually knew of but deliberately disregarded a known risk to Plaintiff's health. Consequently, Plaintiff's Eighth Amendment claim against LaVasseur fails as a matter of law.

### c.       Sharing Plaintiff's Medical Information

Plaintiff suggests that Fuhrman, Caffes, and Dau violated the Eighth Amendment by discussing his medical information with each other and other DOC staff. But neither the allegations nor the evidence of record suggest how the sharing of medical information among Plaintiff's providers and DOC staff evidenced a deliberate *dis*regard of a serious medical need. To the contrary, the reasons for sharing the information were to coordinate and arrive at a consensus about Plaintiff's care, particularly because he was being prescribed a controlled substance at the same time he was in treatment for controlled substance use, and to allow all of Plaintiff's providers to discuss his treatment with him at the same time. (*See* Dau Aff. ¶ 7; Fuhrman Aff. ¶¶ 24, 26.) Doctors and staff in DOC facilities regularly exchange information in formulating a treatment plan for the offender. (Paulson Aff. ¶ 31.) This Eighth Amendment claim fails as a matter of law.

### d.      Denial of Access to Medical Records

Plaintiff alleges he was denied access to his medical records, which violated the Eighth Amendment.  There is no evidence, however, that any failure to provide copies of medical records to Plaintiff resulted in a lack of treatment or adversely affected his prognosis.  In fact, the evidence before the Court shows that Plaintiff was advised in June 2014 how to obtain copies of his medical records, but he failed to follow the required procedures.  (Marben Aff. ¶ 7 [Doc. No. 61].)  Plaintiff was provided records in response to his October and November 2014 requests.  (*Id.* ¶ 8.)  Thus, Plaintiff was not denied access to his medical records and he cannot establish an Eighth Amendment violation based on his requests for medical records.

### e.      Allegedly False Entries in Medical Records

Plaintiff claims that Dau and Caffes falsely recorded his acquiescence to medical treatment in his medical records.  Plaintiff does not identify the treatment or the particular statements, however, nor has he provided any evidence that the statements were false.  Dau denies entering false information on Plaintiff's chart.  (Dau Aff. ¶ 8.)  Even if Plaintiff had come forth with evidence that the entries were false, he has not provided verifying medical evidence that Dau or Caffes ignored an acute or escalating medical need, that the entries adversely affected his prognosis, or that Dau of Caffes disregarded a known risk to his health.

Relatedly, Plaintiff alleges that Fuhrman reported false information about his sleepiness.  Plaintiff does not describe how the information was false or provide evidence that his sleepiness was worse than Fuhrman reported.  Even if he had provided evidence

of falsity, there is no verifying medical evidence that Fuhrman ignored an acute or escalating medical need, that Plaintiff's prognosis was adversely affected, or that Fuhrman disregarded a known risk to Plaintiff's health.

Plaintiff cannot establish an Eighth Amendment violation based on the allegedly false entries in his medical records.

### f.    Claims Against Supervisors

Because Plaintiff "has not shown that his care was constitutionally deficient," his Eighth Amendment claims against Jorgenson, Huot, Larson, Smith, and Esty in their supervisory capacity fail as a matter of law. *See Gibson*, 433 F.3d at 647. Alternatively, the claims fail because "[s]upervisors are not liable for [E]ighth [A]mendment claims brought under section 1983 on a respondeat superior theory." *See Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989) (citation omitted). This includes Plaintiff's allegations that Huot, Esty, and Smith did not respond to Plaintiff's kites asking them to intervene in the conduct of subordinates; and that Larson did not ensure her orders were followed by Dr. Quiram and Caffes. In fact, as to Larson, although she is the Director of DOC Health Services, she is not a doctor, and she does not make decisions regarding medication or medical treatment. (Paulson Aff. ¶ 34.) She must defer to the medical expertise of licensed medical providers such as Dr. Quiram. (*Id.*) Thus, Larson did not have supervisory authority over Dr. Quiram.

In addition, Plaintiff has not shown that Jorgenson, Huot, Larson, Smith, or Esty knew of a constitutional violation and tacitly authorized or recklessly disregarded it or that these Defendants committed an Eighth Amendment violation through their own

actions.  *See Howard*, 887 F.2d at 137-38.  This includes Plaintiff's allegations that

Larson prevented Plaintiff from seeing a specialist and that Jorgenson told Dr. Augdahl to

discontinue Plaintiff's Adderall.

### 3.      Fourteenth Amendment Claims

Though Plaintiff references the Fourteenth Amendment throughout his Second

Amended Complaint, it is not clear whether he referred to the Fourteenth Amendment in

acknowledging that the Eighth Amendment applies to the states through the Fourteenth

Amendment or whether he intended to state separate causes of action for violations of his

substantive due process rights.  If he intended the former, the Court has analyzed his

Eighth Amendment claims above.  To the extent he intended the latter, substantive due

process does not apply when another constitutional amendment explicitly provides a

source of constitutional protection.  *See Sacramento Cty. v. Lewis*, 523 U.S. 833, 842

(1998).  A substantive due process analysis is appropriate only if Plaintiff's claims are

not "covered by" the Eighth Amendment.  *Id.* at 843.  Because Plaintiff's claims are

completely covered by the Eighth Amendment, his Fourteenth Amendment claims are

superfluous.

### 4.      Summary Judgment Should be Awarded to Defendants on All § 1983 Claims

Based on the above, the Court recommends that summary judgment be granted to

the DOC Defendants on the individual capacity § 1983 claims on the grounds of qualified

immunity, and that summary judgment be granted to the Centurion Defendants on the

merits of all § 1983 claims.  The facts of record, viewed in the light most favorable to

Plaintiff, create no genuine issue for trial, but establish that Defendants are entitled to judgment as a matter of law.

### D.   ADA Claims

Plaintiff brings ADA claims against Dr. Quiram, Dr. Eldridge, Dr. Augdahl, Director of Centurion Managed Care, Fuhrman, Jorgenson, Caffes, Hard, Dau, Huot, Larson, Esty, and Smith.  Specifically, he alleges that Dr. Quiram violated the ADA by denying him Adderall and impeding his participation in a federally funded program, the Atlantis Program.  He makes a similar allegation against Jorgenson.  Plaintiff further alleges that Hard discriminated against him by announcing "The kid on Adderall is here" at a medical appointment.  Plaintiff's ADA claims against the other Defendants are based on the alleged denial of medication and inadequate medical care.  (*See id.* at 11.)

With respect to the alleged denial of medication and inadequate medical care, medical treatment decisions cannot form the basis of an ADA claim.  *Dinkins v. Corr. Med. Servs.*, 743 F.3d 633, 634 (8th Cir. 2014); *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005).  Therefore, Dr. Eldridge, Dr. Augdahl, Director of Centurion Managed Care, Fuhrman, Caffes, Dau, Huot, Larson, Esty, and Smith are entitled to summary judgment on Plaintiff's ADA claims based on medical treatment decisions.

With respect to Plaintiff's participation in the Atlantis Program, under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  To establish a violation, Plaintiff must show: "(1) that he is a

qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of the jail's services, programs, or activities, or was otherwise subjected to discrimination by the jail; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010). Plaintiff's claim fails for the simple reason that he was not denied the opportunity to participate in or benefit from the Atlantis Program. Rather, the undisputed evidence establishes that Plaintiff was admitted to, participated in, and completed the Atlantis Program in the average amount of time. (Edokpayi Aff. ¶ 9; Fuhrman Aff. ¶¶ 13, 21 & Ex. J.) Consequently, Plaintiff's claim that Dr. Quiram and Jorgenson violated the ADA by denying him the opportunity to participate in the Atlantis Program fails as a matter of law.

Plaintiff does not specify which section of the ADA was allegedly violated by Hard's alleged comment. Regardless, Plaintiff has not shown that Hard excluded him from participating in, or denied him benefits of, a service, program, or activity. Nor do any facts of record demonstrate that Hard failed to accommodate Plaintiff or that she discriminated against him on the basis of a disability. Finally, a stray remark such as the one attributed to Hard cannot constitute direct evidence of discrimination. *Browning v. Pres. Riverboat Casino-Mo., Inc.*, 139 F.3d 631, 635 (8th Cir. 1998) (quotation omitted). Accordingly, Plaintiff's ADA claim against Hard fails as a matter of law.

### E.    Request for Injunctive Relief

Plaintiff asks the Court to issue an injunction directing the DOC to provide specific doses of Provigil and Adderall. A claim for injunctive relief is moot when the

alleged conduct ceases and there is no reasonable expectation it will be repeated.

*Roubideaux v. N.D. Dep't of Corr. & Rehab.*, 570 F.3d 966, 976 (8th Cir. 2009) (quoting

*Mo. Pro. & Advocacy Servs., Inc. v. Carnahan*, 499 F.3d 803, 811 (8th Cir. 2007).

Plaintiff's request for injunctive relief is moot because he is no longer incarcerated and

his medical care is no longer provided by the DOC.  Accordingly, the Court recommends

that the request for injunctive relief be denied as moot.

### F.      State Law Claims

Defendants are entitled to summary judgment on all of Plaintiff's federal claims,

leaving only state law claims.  Subject matter jurisdiction in this case was premised on

the existence of a federal claim, and this Court's jurisdiction over the state law claims

existed solely under 28 U.S.C. § 1367(a).

"[I]n any civil action of which the district courts have original jurisdiction, the

district courts shall have supplemental jurisdiction over all other claims that are so related

to claims in the action within such original jurisdiction that they form part of the same

case or controversy under Article III of the United States Constitution."  28 U.S.C.

§ 1367(a).  A court "may decline to exercise supplemental jurisdiction over a claim under

subsection (a) if . . . the district court has dismissed all claims over which it has original

jurisdiction.  *Id.*  § 1367(c)(3).  When all federal claims "are dismissed before trial, even

though not insubstantial in a jurisdictional sense, the state claims should be dismissed as

well."  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *Andrewin v.*

*Abraham*, No. 08-cv-5866 (DWF/JSM), 2009 WL 3428854, at *3 (D. Minn. Oct. 23,

2009) (noting the court "would decline to exercise its supplemental jurisdiction over"

27

state law claims "because it has dismissed the only claim over which it had original jurisdiction"). Accordingly, the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims and dismiss them without prejudice.

## IV. Recommendation

Based on the foregoing and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendants Michelle Smith, Chris Esty, Melissa Caffes, Nanette Larson, Terry Jorgenson, Steve Huot, Sara Hard, Diane Dau, Dawn LaVasseur, and Marina Fuhrman's Motion for Summary Judgment [Doc. No. 53] be **GRANTED IN PART** and **DENIED AS MOOT IN PART**, in that:

    a. Plaintiff's federal law claims be **DISMISSED WITH PREJUDICE**;

    b. Plaintiff's state law claims be **DISMISSED WITHOUT PREJUDICE**; and

    c. Plaintiff's request for injunctive relief be **DENIED AS MOOT**.

2. Defendants Centurion of Minnesota, Darryl Quiram, Lon Augdahl, and Kenneth Eldridge's Motion for Summary Judgment [Doc. No. 66] be **GRANTED**, in that:

    a. Plaintiff's federal law claims be **DISMISSED WITH PREJUDICE**; and

    b. Plaintiff's state-law claims be **DISMISSED WITHOUT PREJUDICE**.

3. **JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  May 24, 2016                    s/ Hildy Bowbeer
                                        HILDY BOWBEER
                                        United States Magistrate Judge

## **NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.